IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GEORGE W. LEGG | * | |
| | * | |
| v. | * | Civil No. JFM-02-533 |
| | * | |
| THE COUNTY COMMISSIONERS | * | |
| OF DORCHESTER COUNTY | * | |

*****

OPINION

This action was originally instituted by George W. Legg, III, against the County Commissioners of Dorchester County, ("the County") in the Circuit Court for Dorchester County, Maryland. Legg asserts claims for inverse condemnation under the federal and the Maryland constitutions, nuisance, and negligence arising out of the possible migration of leachate[1] and methane gas into Legg's land from an adjacent landfill owned by Dorchester County.

The County removed the action to this court on the basis of Legg's federal inverse condemnation claim. The County has now filed a motion to dismiss on limitations grounds. I will grant the motion as to Legg's federal inverse condemnation claim and remand the action to the Circuit Court for Dorchester County for final resolution of Legg's state law claims.

I.

Until 1991, Legg's grandmother, Freida M. Richardson, and the Freida M. Richardson Family Limited Partnership (the "Partnership") owned a parcel of land near Secretary, Maryland.

---

[1] Leachate is water which has percolated through a solid mass carrying with it contaminates in a soluble and suspended state. (Compl. ¶ 10.)



(Compl. ¶ 1.) On July 2, 1974, Richardson leased approximately 28.5 acres of the land to the defendant for landfill use for ten years. (Id. ¶ 4.) The County entered into the lease to establish a landfill for disposal of rubbish, garbage, refuse, and other solid waste. (the "Secretary landfill") (Id.) On March 1, 1991, the County purchased the Secretary landfill from the Partnership. (Id. ¶ 6.) Currently, the landfill is closed and not operating. (Letter from Laws to Defendant, Def. Ex. 1.) Adjacent to the Secretary landfill is 16.5 acres of land. This 16.5 acres (the "residue farm") is currently owned by Legg, who was the successor in interest to his grandmother and the Partnership. (Id. ¶¶ 1, 2.)

In 1987, Earth Data Corporation ("Earth Data") prepared an environmental study of the Secretary landfill on behalf of the County. (Id. ¶ 9.) In the report, Earth Data made several findings, including that the Secretary landfill was producing 7,500 to 15,000 gallons of leachate per day. (Id.) The majority of the leachate enters the Warwick Creek in a northerly direction away from the residue farm. However, according to Earth Data, substantial amounts of leachate enters adjoining tillable farm fields owned by Legg. (Id.) Earth Data recommended to the County that no wells be drilled into the aquifer within one-half mile of the landfill, an area that includes plaintiff's residue farm, and that the County should monitor the concentrations of methane gas produced by the landfill. (Id. ¶ 11.)

In 1996, Legg entered into negotiations with William Peckham for the sale of the residue farm. (History of Landfill Farm, Def. Ex. 3.)[2]  Peckham planned on subdividing the residue

---

[2]The History of Landfill document is a document briefly describing the history of the land previously owned by Legg's grandmother, Freida M. Richardson. It is signed by both Legg and his attorney.

farm into 22 lots. (Id.) To determine whether the potential subdivision of the residue farm was appropriate, the Maryland Department of the Environment ("MDE") examined the Secretary landfill. (Id. ¶ 9; Compl. Ex. D.) MDE, in a letter sent to the County, determined that the groundwater under the landfill was moving away from the residue farm into the Warwick River. MDE stated that the installation of 22 drinking wells on the residue farm could cause the groundwater to enter the residue farm. (Compl. ¶ 13; Compl. Ex. D at 1.) MDE recommended that care be taken to ensure safe water supplies if the proposed subdivision went forward, including construction or expansion of a public water supply, use of a double-cased well construction, or a system of monitoring and treating the water supply to remove contaminants. (Compl. Ex. D at 2.)

MDE also expressed concern about the migration of methane gas from the waste. (Compl. ¶ 14; Compl. Ex. D at 2.) Under certain conditions, gas can migrate several hundred feet through the ground and cause explosions or flash fires where it accumulates. (Compl. ¶ 15.) Any structure into which soil gas enters can be at risk. Possible points of entry include underground utility line entries, porous foundations, and cracks in the foundation or concrete. (Compl. Ex. D at 2.) MDE recommended that if development occurred adjacent to the landfill, care would have to be taken to protect owners from the risk of explosions caused by the migration of landfill gas, for example, by building a physical barrier underground. (Id.) As a result of the letter, the potential sale to Peckham fell through. (History of Landfill ¶ 10, Def. Ex. 3.)

Legg intends to develop the residue farm for residential use and alleges that he has received offers from individuals desiring to purchase the land for development. (Compl. ¶ 12.)

On February 24, 1998, Legg's attorney wrote to the County offering to sell to it the residue farm. (Compl. Ex. F; Compl. Ex. G.) In his letter Legg blamed the defendant for his inability to sell his property to Peckham in 1996. (Letter from Laws to Defendant, Def. Ex. 1.) Legg's offer was rejected by the defendant on August 22, 2000. (Compl. Ex. G.) Subsequently, on January 14, 2002, Legg filed suit in the Circuit Court for Dorchester County. The County then removed the action to this court.

II.

It is undisputed that Maryland's general three-year statute of limitations applies to all of Legg's claims, including his claim for federal inverse condemnation. See Md. Code Ann., Cts. & Jud. Proc., § 5-101.[3] It is also undisputed that Maryland follows the discovery rule under which "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." Poffenberger v. Risser, 431 A.2d 677, 680 (Md. 1981).

The limitations period begins to run when the claimant gains "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry." Id. at 681. "Therefore, in simple terms, a plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has 'knowledge of circumstances which would

---

[3] As an initial matter, I note that because I am considering two extrinsic documents provided by the defendant with its motion (the letter from Legg's counsel to the County dated February 24, 1998 and the History of the Landfill Farm), I am converting the defendant's motion to dismiss to a motion for summary judgment. See Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 260-61 (4th Cir.1998); Rohan v. Networks Presentation, LLC., 175 F.Supp.2d 806, 809 (D. Md. 2001). This causes no prejudice to Legg because consideration of these documents creates no genuine dispute of material fact. What is material about the February 24, 1998 letter are the facts that the letter itself reflects were known to Legg as of the date of the letter. The History of the Landfill Farm merely provides a narrative outline of the facts from Legg's perspective.

cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].'" Lumsden v. Design Tech Builders, Inc., 749 A.2d 796, 802 (Md. 2000) (citing Pennwalt Corp. v. Nasios, 550 A.2d 1155, 1163 (Md. 1988)). It is not necessary that the plaintiff have notice of actual harm. Rather, he must have had notice only of potential or possible harm. See Russo v. Ascher, 545 A.2d 714, 717 (Md. Ct. Spec. App. 1988) ("[A] claimant is held to be 'on notice' when he has actual knowledge (express or implied) of a possible harm."); see also Hess v. Firestone Plastics Co., 1989 WL 27489, at *2 (4th Cir. 1989) (unpublished) (holding the three-year Maryland statute of limitations period barred plaintiffs' claims where the plaintiffs were on notice "of the potential health hazards and economic damages resulting from their proximity to the landfill" more than three years before suit was filed).

The existing record makes it clear that Legg's federal inverse condemnation claim is time-barred. The MDE letter dated December 3, 1996 identified the groundwater and methane gas problems that concerned the Department of the Environment and recommended that if development of the residue farm were to be permitted, notice of the environmental dangers be given to prospective land purchasers.[4] Further, the letter recommended that construction of a public water supply, construction of wells designed to reach deeper aquifers, or establishment of

---

[4]The MDE letter also explicitly mentioned and invited reference to the 1987 Earth Data report that explained more fully the groundwater problems. Since Legg received a copy of the MDE letter, he was put on inquiry notice of what the Earth Data report said, whether or not he then read it. Likewise, although he has argued in his opposition memorandum that neither the report nor the MDE letter put him on inquiry notice of the injury or potential injury to his property, that argument is inconsistent with his exclusive reliance upon those documents in making allegations of damages in the Complaint.

a water monitoring and treatment system be required in the event of the property's development. The expression of these concerns by MDE self-evidently had at least a possible or potential effect on the value of the residue farm. Indeed, according to the History of the Landfill Farm signed by Legg and his counsel, the MDE letter was a "torpedo" that "sank the Peckham proposal and tentative sale" when it was issued in connection with a hearing held by the County's Planning Commission on December 4, 1996. The letter's adverse impact was confirmed by the letter sent by Legg's counsel to the County on February 24, 1998, offering to sell the residue farm to the County. That letter was written more than three years before this suit was filed.

III.

Legg's negligence claim and inverse condemnation claim under the Maryland Constitution would appear to be barred by limitations for the same reasons as his federal inverse condemnation claim. The same is true as to his nuisance claim to the extent that it seeks damages for the permanent reduction in the value of the residue farm from the alleged nuisance created by the landfill. See Goldstein v. Potomac Elec. Power Co., 404 A.2d 1064, 1068 (Md. 1979). However, Maryland law draws a distinction between permanent and temporary nuisances. Each new day of a temporary nuisance, i.e., one that can be abated, gives rise to a new cause of action. See Hoffman v. United Iron & Metal Co., 671 A.2d 55, 69 (1996). Therefore, Legg's nuisance claim may not be time-barred in its entirety. Because the claim raises difficult questions of land use law and policy falling within the particular competence of the Maryland courts,[5] I will remand it (as well as the negligence claim and the inverse condemnation claim

---

[5]For example, I note that Legg has made a claim for an injunction to abate the alleged nuisance. Is that claim cognizable or merely an attempt to circumvent the rule of Goldstein v.

-6-

under the Maryland Constitution) to the Circuit Court for Dorchester County for its consideration. See Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988); Hinson v. Norwest Fin. South Carolina, Inc., 239 F.3d 611, 616-17 (4th Cir. 2001).

A separate order is being entered herewith.

Date: May 15, 2002

J. Frederick Motz
United States District Judge

---

Potomac Elec. Power Co. barring recovery for the permanent reduction in the value of property caused by a nuisance? In that connection, should a distinction be drawn between an injunction that would require the County to build a wall to block the migration of methane and an injunction that would require it to extend the public water system or build deep wells on the residue farm? Is the former a genuine act of abatement while the latter an improvement to Legg's property necessitated by the permanent groundwater nuisance, the cost of which he must bear because his claim is time-barred? Assuming that a court of equity could enjoin the County to construct a wall to block the migration of methane, should it do so now or defer that decision until and unless Legg can establish that the residue farm would be developed but for the possible presence of the methane? Cf. Moy v. Bell, 416 A.2d 289 (Md. 1980). These are among the questions that it is appropriate for the Maryland courts to resolve.